UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIEN CADWALLADER,

                        Plaintiff,

v.                                                      3:15-cv-139
                                                        (TJM/DEP)

RICHARD J. DEVLIN, JR., COUNTY OF
OSTEGO, ADAM PIERCE, LYNN BAULCH,
LINDA GILMORE, JULIE ANDREWS,
ADAM TILBE, MICHAEL ELLWANGER, JARED
HUBBARD, JAMES RASO, JESSE TOURELLA,
CHRISTOPHER OWENS, KYLE LAMP,
AARON CLEVELAND, PAULA DICK,
MICHAEL CLARK, KEVIN BARROWS,
DAVID PLEDGER, JR., and PATRICK LAPORTE,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THOMAS J. McAVOY
Senior United States Judge

## AMENDED DECISION and ORDER

        Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983, alleging

that Defendants violated his constitutional rights while he was incarcerated.  Presently

before the Court is Defendants' motion for judgment on the pleadings.  See dkt. # 49.

The Court has determined to decide the motion without oral argument.

## I.      BACKGROUND

        Plaintiff Adrien Cadwallader filed the instant Complaint pursuant to 42 U.S.C. §

1983 on February 9, 2015.  See dkt. # 1.  This action concerns Plaintiff's treatment

while incarcerated at the Ostego County Jail.  Plaintiff alleges that he was attacked by a

pit bull on January 11, 2012, sustaining serious injuries to his legs.  Id. at ¶ 15.  He

spent two days in the hospital and was released with a prescription for oral antibiotics.

Id.  By January 20, 2012, Plaintiff was back in the hospital with a serious infection of the wound site in both legs.  Id. at ¶ 16.  Doctors at St. Peter's Hospital in Albany, New York told him that if they failed to control the infection he could lose his leg or even die if the infection spread.  Id.  After a week in the hospital, Plaintiff's infection was controlled and he was well enough to be released with a prescription for Augmentin, an oral antibiotic.  Id.

Plaintiff was on parole at the time, and as a condition of his parole, Defendant Patrick LaPorte, his parole officer, ordered him to enter a residential treatment program for heroin addition upon his release from the hospital.  Id. at ¶ 17.  LaPorte knew of Plaintiff's hospitalization and treatment for infection.  Id. at ¶ 18.  He also knew of Plaintiff's heroin addiction and longstanding mental health issues and treatment needs.  Id.  On February 1, 2012, Plaintiff entered the residential treatment program and began receiving medication for opiate withdrawal.  Id. at ¶ 19.  He also received therapy and medication for "several long standing mental health issues including post-traumatic stress disorder (PTSD), anxiety disorder, depressive disorder, oppositional defiant disorder and attention-deficit/hyperactivity disorder (ADHD)."  Id.  He also took medication to help him sleep because of recurrent PTSD and nightmares associated with the dog attack.  Id.

Several days into his stay at the treatment center, Plaintiff noticed red streaks on his legs near the site of his bite wound.  Id. at ¶ 20.  These streaks "reminded him" of the infection that put him in the hospital in the first place.  Id.  He advised facility staff, and tests revealed a methicillin resistant staphylococcus aureus ("MRSA") infection.  Id.  A doctor prescribed Vancomycin, an antibiotic, to be taken twice daily for ten days to

2

treat the MRSA on February 6, 2012.  Id. at ¶ 21.  The stop date for the medication was

February 16, 2012.  Id.  The physician also ordered medication to treat the pain from

the wound and infection.  Id.

Though the symptoms associated with the MRSA infection began to clear up

with use of the medication, Plaintiff suffered other health issues related to the stress

and anxiety of the dog attack and its aftermath as well as the challenges of heroin

withdrawal and mental health problems.  Id. at ¶ 22.  Plaintiff eventually suffered a

panic attack that placed him in the hospital and the treatment program discharged him.

Id. at ¶¶ 23-24.  The treatment program advised Defendant LaPorte of Plaintiff's

discharge.  Id. at ¶ 24.  LaPorte arrived at the center at 9:00 a.m. on February 9, 2012

to arrest Plaintiff for violation of the terms of his parole.  Id.

At the time of his discharge and arrest, the treatment center staff gave LaPorte

physicians' orders for the medications Plaintiff was taking for his MRSA infection, pain

from that infection, heroin withdrawal, PTSD and anxiety.  Id. at ¶ 25.  The orders

included:

> Vistaril 50 mg po prn for anxiety (po means orally, prn means as needed),
> Neurontin 300 mg po qid (qid means 4 times a day), a Suboxone taper to
> be completed 2/13/12, Augmentin 125 mg po bid x 10 days (bid means
> twice a day).  Cleanse wound daily with Neosporin and apply telfa and
> Kling for C +S, D/C Augmentin, Vancomycin 500 mg po bid x 10 days
> (MRSA) (stop date 2/16/12), Ultram 50 mg po q6 hrs prn pain.

Id. at ¶ 25.  Plaintiff alleges that clinic staff informed LaPorte of the importance of these

medications and LaPorte reviewed the list of medications when he took Plaintiff into

custody.  Id. at ¶ 26.  Plaintiff importuned LaPorte to get this list of medications because

of his serious physical and mental-health needs.  Id. at ¶ 27.  Plaintiff alleges that

Defendant LaPorte told him not to worry.  Id.  LaPorte would insure that the Otsego County Jail (the "Jail") received the medications list and his medical needs would be taken care of.  Id. at ¶ 27.  Despite this promise, Plaintiff alleges, LaPorte did not accompany Plaintiff to the Jail, nor did he give the police officers who took Plaintiff to the jail copies of the orders.  Id. at ¶¶ 28-29.  He did not notify anyone at the Oneonta Police Department or Otsego County Jail regarding Plaintiff's medical needs.  Id. at ¶ 30.

Plaintiff had an anxiety attack while being booked into the Jail on February 9, 2012; he was taken for treatment to A.O. Fox Hospital in Oneonta.  Id. at ¶ 31.  Doctors treated Plaintiff for his anxiety and hyperventilation.  Id. at ¶ 32.  Plaintiff informed them of his medical history, including his current treatment for MRSA, heroin withdrawal and anxiety disorder.  Id.  Plaintiff alleges that he told staff in the emergency room that LaPorte had the prescriptions the treatment center had provided.  Id. at ¶ 33.

After Plaintiff was discharged from the hospital, Oneonta Police took him to the Oneonta Police Department where they completed booking and held him for several hours.  Id. at ¶ 34.  Plaintiff suffered another anxiety attack as officers returned him to the Ostego County Jail around 8:40 p.m. on February 9, 2012.  Id. at ¶ 35.  He told officers of his distress and need for medical care.

When Plaintiff arrived at the Jail he spoke with Defendant Sgt. Adam Tilbe, who was the booking officer.  Id. at ¶ 36.  Plaintiff was anxious because he had not yet received his medications.  Id.  He told Tilbe that he needed his MRSA medications, and that he could die if he did not receive them.  Id.  Tillbe noted that Plaintiff was shaking during the interview.  Id.  Tilbe had Plaintiff placed in a holding room near the booking

area, and Plaintiff alleges that Tilbe called the Supervising Facility Nurse and informed her that Plaintiff was shaking and claimed to have difficulty breathing. Id. at ¶ 37. Plaintiff alleges that he was at that point suffering from the effects of his anxiety attack and the lack of medication to treat his heroin withdrawal and pain. Id. at ¶ 38. He repeatedly informed Jail staff of his condition, asking for medical assistance. Id.

At approximately 9:40 p.m., Otsego County Sheriff's Department staff took Plaintiff to the emergency room of Bassett Hospital in Oneonta, New York. Id. at ¶ 39. There, Plaintiff told hospital staff of his MRSA infection and the need for antibiotic medication to control it. Id. at ¶ 40. He showed the doctor the wounds on his legs and a red boil-like spot on his abdomen. Id. He also told staff that he had not received any medication since 6 a.m. and that he suffered from heroin withdrawal, depression and anxiety. Id. at ¶ 41. Medical staff diagnosed him with depression, anxiety and suicidal thoughts. Id. at ¶ 42. Plaintiff recieved an anti-anxiety drug and rested in the ER. Id. He was discharged from the hospital at around 12:50 a.m. on February 10, 2012. Id. at ¶ 42. Discharge orders indicated that Plaintiff should receive an anti-anxiety drug up to four times a day to treat restlessness and anxiety, that he should be placed on one-to-one observation, and that a health-care provider at the Jail should evaluate Plaintiff in the morning. Id. at ¶ 43. Plaintiff alleges that these orders were provided to Otsego Sheriff's Department Officers at the hospital. Id. at ¶ 44.

Deputies returned Plaintiff to the Jail at approximately 1:15 a.m. on February 10, 2012; a deputy brought with him discharge instructions from the hospital for Plaintiff and

gave them to Tilbe.  Id. at ¶¶ 45.[1]  Defendant Tilbe questioned Plaintiff at approximately

1:30 a.m. as part of the booking process.  Id. at ¶ 46.  Plaintiff informed Tilbe that he

needed his medications for MRSA, mental health, heroin withdrawal and pain.  Id. at ¶

47.  He warned Tilbe that he could die without the MRSA antibiotics, and that the other

medication was necessary as well.  Id. at ¶ 48.  Plaintiff alleges that Tilbe informed him

he would get his medication if the nurse said he could have it.  Id. at ¶ 49.  Tilbe placed

Plaintiff in a room at the Jail that contained a correction officers' station and ordered

that he be placed under constant watch.  Id. at ¶ 50.

Plaintiff alleges that the discharge instructions informed Tilbe that Plaintiff

needed to take the medications, but Tilbe ignored those instructions.  Id. at ¶ 51.  Tilbe

also ignored his duty to inform the medical staff of Plaintiff's serious medical needs.  Id.

at ¶ 52.  He did not, Plaintiff alleges, inform the supervising nurse or any other Jail

medical personnel that Plaintiff had informed him of his MRSA infection, the antibiotics

prescribed for that condition, or any other of Plaintiff's symptoms.  Id. at ¶ 53.  Instead,

Plaintiff was taken to a room where a mattress on a protective plastic tray was placed

on the floor, given jail clothing and directed by Jail staff to sleep on the mattress.  Id. at

¶ 54.  Bright lights remained on in the room 24 hours a day, and officers were seated at

a desk in a room close to the bed to keep Plaintiff under constant watch.  Id. at ¶ 55.

Plaintiff remained in the room for the next eight days, until February 17, 2012.

Id. at ¶ 56.  Corrections officers and sergeants frequently congregated in the room, just

a few feet from where Plaintiff was on his bed.  Id. at ¶ 56.  The officers discussed a

_____

[1]The Complaint repeats paragraph 45.

variety of topics and used the computer on the desk for jail and personal business.  Id.

They also used the computer to stream music and play games.  Id.  Plaintiff remained

on the mattress at all times, except to walk and to use the sink and toilet in the room.

Id. at ¶ 57.  He was fed while on the mattress and was not permitted to have any

personal property, read anything, or make calls to family or attorneys.  Id. at ¶ 57.

Officers' conversations and computer noise prevented him from getting proper sleep,

and he was not permitted to use the toilet or sink in the room where he was held and

could not shower or exercise.  Id. at ¶¶ 57-58.

On the morning of February 10, 2012, Defendant LaPorte was at the Jail.  Id. at

¶ 59.  Plaintiff spoke with him, requesting that LaPorte intervene and get him the

medications he needed.  Id.  LaPorte told Plainitff he would speak with the Jail's

medical staff immediately and give the staff the prescriptions from the treatment facility.

Id. at ¶ 60.  He did not do so, nor did he later follow up with the Jail about the

prescriptions.  Id. at ¶ 61.

Also on February 10, 2012, Defendant Julie Andrews, a psychiatric nurse

practitioner employed by the Defendant County, interviewed Plaintiff at the Jail.  Id. at ¶

62.  Plaintiff told her that he needed his medications and that he could die from his

MRSA infection without the prescribed antibiotic.  Id. at ¶¶ 63-64.  He also informed

Andrews that he had not received any of his medications since the previous morning.

Id. at ¶ 65.  Andrews told Plaintiff that he would not receive the anxiety medication that

he had received at the facility, but that other possible medications existed.  Id. at ¶ 65.

Plaintiff responded that he knew what medications worked for him, and that the

medication suggested by Andrews did not work for him.  Id. at ¶ 66.  Plaintiff stated that

"if he couldn't get his needed medications then there was nothing to talk about and he left the room." Id. at ¶ 66.

Plaintiff alleges that Defendant Andrews "deliberately ignored" Plaintiff's requests for MRSA medication and the discharge orders from Bassett hospital directing anxiety medication. Id. at ¶ 67. Plaintiff alleges that she "did nothing to address Plaintiff's serious medical needs." Id. She did not ask Plaintiff about his prior treatments for the dog bite, infection and ensuing pain, and did not ask about medication and treatment for heroin withdrawal and anxiety. Id. Andrews failed to notify the Jail's Supervising Facility Nurse or any other facility or medical staff about Plaintiff's medical needs. Id. at ¶ 68. Instead, she scheduled Plaintiff for an appointment for February 17, 2012, her next scheduled work day at the Jail. Id.

Defendant Lynn Baulch was the Ostego County Jail Supervising Facility Nurse. Id. at ¶ 69. As of February 10, 2012, she was on call 24 hours a day, seven days a week. Id. She was the only full-time nurse employed by the Jail, working an eight-hour day Monday through Friday and two Saturdays a month. Id. at ¶ 75. Facility staff could contact her regarding inmate medical matters. Id. at ¶ 69. Baulch was responsible for insuring that Plaintiff's medical history was documented and evaulated upon his arrival at the Jail. Id. at ¶ 69. Baulch was also responsible for conducting an initial medical evaluation of Plaintiff or arranging for that procedure. Id. at ¶ 70. Plaintiff alleges that Defendant Tilbe informed Baulch that Plaintiff had a serious medical need on February 10, 2012. Id. at ¶ 71. Baulch, however, allegedly failed to make arrangements for anyone to interview or evaluate Plaintiff regarding these needs. Id. Baulch also failed to inform anyone at the jail over the next five days that Plaintiff needed to receive

8

medication and treatment.  Id. at ¶ 73.  The Defendant County also employed a part-time nurse who worked at the jail, but the County did not assign the part-time nurse to fill in when the full-time nurse was out on sick leave.  Id. at ¶ 76. As a result, there was no medical nurse or physician at the Jail for five consecutive days, as Baluch was out on sick leave.  Id. at ¶ 77.

Plaintiff also alleges that Defendant Richard J. Devlin, Jr., Otsego County Sheriff, and Defendant Otsego County had deficient policies and procedures for ensuring proper care of inmates like Plaintiff.  Id. at ¶¶ 74, 78-82.  Plaintiff alleges that an insufficient number of medical providers and staff were present at the Jail, causing a failure to provide a timely and adequate medical evaluation of the Plaintiff.  Id. at ¶ 78. Plaintiff also contends that the Defendants lacked an adequate policy and procedure for screening inmates who were at a high risk of opiate withdrawal or arrived with potentially dangerous infections, like the MRSA Plaintiff suffered.  Id. at ¶¶ 79, 81. These policies caused Plaintiff pain and suffering, both from opiate withdrawal and pain from his infection.  Id. at ¶¶ 80, 82.

Plaintiff further alleges that Defendants Sgt. Michael Ellwanger, Corrections Officers Jared Hubbard, James Raso, Jesse Tourella, Christopher Owens, Kyle Lamp, Aaron Cleveland, Paula M. Dick, Micahel Clark, Kevin Barrows and David Pledger, Jr., observed Plaintiff in the room where he was held and knew of his physical and mental health issues.  Id. at ¶ 83.  Plaintiff told each of these defendants that he needed medical care and access to his prescribed antibiotic to treat his MRSA infection.  Id. at ¶ 84.  He showed each defendant "the wounds and abscesses on his legs and abdomen" each day, demonstrating his worsening condition.  Id.  Plaintiff also complained of the

pain and emotional distress his infection was causing.

Plaintiff's condition worsened during the first days of his incarceration. He complained to all of the guards assigned to watch him about his need for medication for his infection and his withdrawal. Id. at ¶ 85. On February 10, 2012, when Plaintiff was placed in the room, he could see red streaks on his legs as the infection began spreading from his leg wounds. Id. Plaintiff was aware of the dangerous nature of this condition due to his prior treatment. Id. By Saturday, February 11, 2012, Plaintiff could feel his stomach becoming distended as the infection spread. Id. at ¶ 86. A doctor at Bassett had noted a red boil-like infection on his abdomen early in the morning on February 10, 2012, and Plaintiff became extremely concerned about this issue. Id. On February 12, 2012, the boil began to ooze puss, bled, and grew larger and more painful. Id. at ¶ 87. None of the corrections officers Plaintiff asked for help did anything. Id. Plaintiff could not even get rest because of the pain and constant noise and light in his room. Id.

By Monday, February 13, 2012, the boil was continuing to ooze pus, bleed, and grow, and Plaintiff began to notice spots on other parts of his body. Id. at ¶ 88. He believed the infection was spreading. Id. His leg wounds also festered and had discharge. Id. Blood from his wounds stained his jump suit and his bedding was soiled from drainage from the abscess. Id. When he complained to Pledger about his condition, Pledger told him not to touch the area and to go back to bed and lay down. Id. Plaintiff continued to complain to each corrections officer assigned to him about his condition and his need for medication. Id. at ¶ 89. All of these officers ignored his condition and his request for immediate attention. Id. at ¶ 90. Each told him they would

10

"see what I can do," but then told Plaintiff to "shut up and quit complaining" when he continued to demand assistance.  Id.  Plaintiff does allege, however, that at least one of these defendants reported to Defendants Sergeant Ellwanger and Assistant Jail Administrator Lt. Pierce that Plaintiff had requested medication attention for his various conditions.  Id. at ¶ 91.  Those Defendants did nothing to respond to these complaints.  Id. at ¶ 92.  Instead, Sgt. Ellwander instructed the officers not to assist Plaintiff until instructions from the medical staff came.  Id. at ¶ 93.  Plaintiff alleges that this help was not forthcoming; he claims Andrews told several officers that she was angry with Plaintiff and would not authorize any medication until her next regular day at the Jail.  Id. at ¶ 94. Plaintiff alleges that Ellanger also ordered officers not to permit Plaintiff to cover his head with a blanket to block out the lights, shower, get band aids or gauze for his wounds, to make telephone calls, or access any of his property.  Id. at ¶ 93.

Finally, on February 14, 2012, Defendant Pierce came to Plaintiff's room in response to a report by Defendant Lamp about Plaintiff's open, bleeding wound.  Id. at ¶¶ 95-97.  Plaintiff showed Pierce the abscess and told him he needed immediate medical attention.  Id. at ¶ 97.  Pierce ordered that Plaintiff be taken to the hospital for evaluation of the wound.  Id. at ¶ 98.  After evaluating the abdominal abcess, surgeons cut away necrotic tissue around the wound site and cleaned and packed the wound.  Id. at ¶ 99.  After discharge, Plaintiff returned to the Jail.  Id.  The discharge orders provided instructions for daily cleaning and repacking of the wound site, as well as instructions to allow Plaintiff to shower.  Id. at ¶ 100. They also included prescriptions for pain medication.  Id.

Plaintiff was seen by Defendant Linda Gilmore, a nurse at the Jail on February

11

14, 2012. Id. at ¶ 101. Gilmore briefly noted some of Plaintiff's prior medial history and medications, but Plaintiff alleges that her screening was inadequate. Id. The nurse did not document all of Planitiff's serious medical conditions, including his need for medication already prescribed. Id. Plaintiff also alleges that Gilmore did not inquire about Plaintiff's prior treatment for anxiety and opiate withdrawal, and she did not ask about any medication prescribed by a doctor during his visits to three hospitals before his incarceration. Id. at ¶ 102. Gilmore also failed to contact the Supervising Facility Nurse or facility doctor, and did not make any additional inquiries about Plaintiff's medical needs. Id. at ¶ 103.

Plaintiff continued to suffer pain from his infection and surgery, especially when the dressing in the would was changed. Id. at ¶ 104. From February 14, 2012 until February 17, 2012, Defendant Gilmore changed the dressing on Plaintiff's wound but did not arrange for pain medication, despite Plaintiff's requests. Id. During that same period, Plaintiff also failed to receive the anti-anxiety medication prescribed him in the discharge instructions from Bassett Hospital on February 9, 2012. Id. at ¶ 105. Plaintiff continued to suffer from anxiety during this period. Id.

Plaintiff returned to Bassett Hospital on February 17, 2012 because of continued complaints of pain and lack of pain medication and antibiotics from his infection. Id. at ¶ 106. Bassett staff noted that the wound was dirty, discolored and draining. Id. Medical staff treated Plaintiff and released him back to the Jail. Id. Hospital ER staff promised Plaintiff to call the Jail to find out why he had not been given pain medicine prescribed to him on February 14, 2012. Id. at ¶ 107. Plaintiff finally began receiving the prescribed medication on February 17, 2012 after he returned from the hospital. Id.

Plaintiff filed his complaint, *pro se*, on February 9, 2015.  The Complaint raises three claims, all of them alleging that Defendants violated Plaintiff's constitutional rights through deliberate indifference to his serious medical needs while incarcerated. Plaintiff also filed a motion for leave to proceed *in forma pauperis* and a motion for appointed counsel.  See dkt. #s 2, 3.  The Court granted those motions on March 24, 2015.  See dkt. # 4.  The Court appointed pro bono counsel for Plaintiff on June 26, 2015.  See dkt. # 40.  That counsel moved to withdraw his appearance on August 13, 2015, and the Court granted the motion.  See dkt. #s 46-47.   Plaintiff's current attorneys entered their appearances on November 6, 2015.  See dkt #s 52-53.   In the meantime, Defendants Lynn Baulch, Michael Clark, Aaron Cleveland, County of Otsego, Richard J. Devlin, Jr., Paula Dick, Michael Ellwanger, Linda Gilmore, Jared Hubbard, Kyle Lamp, Christopher Owen, Adam Pierce, David Pledger, Jr., James Raso, Adam Tilbe and Jesse Tourella filed an answer and a motion for judgment on the pleadings.  See dkt #s 31, 49. Defendants Patrick LaPorte and Kevin Barrows also filed answers to the Complaint.  See dkt. #s 35, 37.  Barrows joined in the other Defendants' motion for judgment on the pleadings.  See dkt. # 49.  LaPorte did not.  Id.  After delays for Plaintiff to obtain new counsel, the parties have briefed the motion, bringing the case to its present posture.

## II.   LEGAL STANDARD

Defendants have filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  "In deciding Rule 12(c) motions," the Court "employ[s] the same standard applicable to Rule 12(b)(6) motions to dismiss,

"'accept[ing] all factual allegations in the [C]omplaint as true and draw[ing] all reasonable inferences in [the nonmoving party's] favor.'" <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 78 (2d Cir. 2015) (quoting <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 647 F.3d 418, 428 (2d Cir. 2011)).  This tenet does not apply to legal conclusions. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  <u>Id.</u> (quoting <u>Bell Atl. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

### III.   ANALYSIS.

Defendants seek dismissal of the Complaint, arguing that Plaintiff has failed to make out a claim that they were deliberately indifferent to a serious medical need, and that even if he had, they are entitled to qualified immunity.  They raise various grounds, which the Court will address as appropriate.

### A.   Plaintiff's Constitutional Claim

A plaintiff seeking to prevail under Section 1983 must show that Defendant "deprived Plaintiff of a federal or constitutional right while acting under the color of state law."  <u>Cox</u>, 654 F.3d at 272.  In this context, Plaintiff's claim is that he suffered "cruel and unusual punishment" in violation of the Eighth Amendment.   <u>Hernandez v. Keane</u>, 341 F.3d 137, 144 (2d Cir. 2003).  Cruel and unusual punishment "'includes punishments that involve the unnecessary and wanton infliction of pain.'" <u>Id.</u> (quoting <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998).  Prisoners are not entitled to

"'unqualified access to health care[.]" Id. (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992). Still, a prisoner "can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with 'deliberate indifference' to the inmate's serious medical needs." Id. (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). Courts in the Second Circuit have described this standard as "embodi[ng] both an objective and subjective" standard. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). "Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." Id. (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). "Subjectively, the charged official must act with a sufficiently culpable state of mind." Id. "An official acts with deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Chance, 143 F.3d at 702 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Defendants first argue that Plaintiff cannot demonstrate that he suffered a deprivation sufficiently serious to make out a claim. Defendants argue that Plaintiff admits that he was not denied access to medical care during the period between February 7 and February 17, 2012 because the Complaint alleges that Plaintiff received extensive medical treatment, either at the facility itself or when he was transported to Bassett Hospital. Defendants contend that Plaintiff's only complaint is with the particular treatments he received. Since a Plaintiff cannot make out an Eighth Amendment claim on the basis that he would have preferred different treatment,

Defendants insist that Plaintiff has not stated a constitutional claim.

As a general matter an Eighth Amendment claim may proceed if a defendant, "with deliberate indifference, expose[s] [a detainee]" to conditions which "pose an unreasonable risk of serious damage to [her] future health." Helling v. McKinney, 509 U.S. 25, 35 (1993). Thus, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). Since medical conditions "vary in severity . . . a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." Id. at 136-137. Therefore, "a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore an infected gash, 'the failure to provide appropriate treatment might well violate the Eighth Amendment.'" Id. (quoting Chance, 143 F.3d at 702). In Harrison, for example, the Second Circuit noted that "[o]rdinarily, a tooth cavity is not a serious medical condition, but this is at least in part because a cavity is so easily treatable." Id. at 137. Immediate treatment is often unnecessary, but it "is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatment, such as root canal therapy or extraction." Id. "Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." Id.

Here, as explained above, Plaintiff alleges that he arrived at the Otsego County Jail after being diagnosed with various ailments. He had been prescribed medication to

16

treat those conditions, and he allegedly informed jail officials of that fact.  One of those medications was an antibiotic used treat a serious MRSA infection that he obtained during his previous treatment.  Plaintiff further alleges that, despite these doctor's orders and despite his repeated requests that he be provided the medication, the Defendants did not provide him with the antibiotics.  As a result, Plaintiff's infection worsened, spread, and caused him not only great pain, but to require surgery at a local hospital.  Plaintiff's infection, which Defendants left untreated even though Plaintiff repeatedly made them aware that he had a prescription to fight MRSA, is similar to both the untreated gash and the toothache described above: while initially treatable, failing to provide Plaintiff with his medication caused a simple condition to deteriorate to the point where Plaintiff had an open, festering wound that required surgery to repair.  Plaintiff received no timely treatment of the infection even though Defendants were aware of the condition; that represents a conscious disregard of a substantial risk of serious harm. Plaintiff has alleged that he suffered from a serious medical condition that implicates the Eighth Amendment.

Defendants next argue that, even if Plaintiff did suffer a serious medical condition, he has not alleged a culpable state of mind for any of the Defendants. Defendants contend that Plaintiff's complaint alleges that he received medical attention, admitting that Defendants transported him to the hospital for treatment when necessary; he therefore cannot contend that he was deprived of essential medical care. Instead, Defendants insist, Plaintiff attempts to cast his disagreements with the prescribed course of medical treatment provided by the Defendants as a constitutional claim.  Such disagreements, they argue, do not make out a constitutional claim.

Defendants are correct that medical malpractice does not ordinarily rise to the level of a constitutional violation.  See Hathaway, 99 F.3d at 553 (citing Estelle v. Gamble, 428 U.S. 97, 106 (1976)).  A Plaintiff does not make out a constitutional claim by arguing that he should have received different treatment.  Still "while 'mere medical malpractice' is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a 'conscious disregard of a substantial risk of serious harm.'"  Id. (quoting Farmer, 511 U.S. at 839-40).

The Court finds that Plaintiff has alleged that Jail officials in charge of his health care did more than commit simple medical malpractice.  He has alleged that the Defendants recklessly disregarded his medical condition, ignored the prescriptions provided by his doctors, and allowed a serious infection to remain untreated for days, leading to a dangerous decline.  He has alleged that those charged with providing him care had knowledge of that condition, both from the medical records they received and from his own complaints, but that they did nothing while an infection festered and eventually required surgery.  Such conduct, if proved, would demonstrate culpable recklessness.  The motion must be denied in this respect as well.

In the end, Defendants argue as well that none of the conduct Plaintiff alleges on the part of any official amounts to deliberate indifference, and thus fails to satisfy the "subject" standard.  "An official acts with deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk

18

of serious harm exists, and he must also draw the inference.'" <u>Chance</u>, 143 F.3d at 702 (quoting <u>Farmer</u>, 511 U.S. at 837). Making all inferences in favor of the Plaintiff, the Court finds the Plaintiff's allegations sufficient to state a claim against each of the Defendants. The Court will address them in turn.

As to Defendant Gilmore, the Court reads the Complaint to allege that she, as a nurse, performed a screening that made her aware of Plaintiff's serious medical conditions, but that she did not take any adequate measures to insure that he actually received treatment for those conditions. She did nothing to obtain medication prescribed by doctors which would have prevented the worsening of his conditions, and did not even record the need for such treatment. Gilmore did not even bother to make any inquiries to others who treated Plaintiff about the conditions he reported. She did not respond to requests for pain medication, or even adequately change the dressing on his wounds. These allegations make plausible that Gilmore was deliberately indifferent to a serious medical need, and the motion will be denied in this respect.

Plaintiff has also alleged culpable conduct on the part of Defendant Tilbe. Defendants contend that Plaintiff has simply alleged that Tilbe booked Plaintiff into the Jail and then had him immediately transported to the hospital. Plaintiff has also alleged, however, that he made Tilbe aware of his dangerous medical condition and the prescription antibiotics necessary to treat that condition. Moreover, Plaintiff contends that Tilbe saw discharge instructions outlining his medical needs, but did nothing to provide for them. He thus alleges that, despite Tilbe's awareness of his various medical needs, Tilbe did nothing to insure that those needs were met. Plaintiff has therefore alleged deliberate indifference to a serious medical need. His allegations of an

infection so bad he needed surgery to prevent dire consequences demonstrates injury as a result. The motion will be denied with respect to Defendant Tilbe.

Defendants argue that Defendant Pierce cannot be liable because Plaintiff admits that Pierce had him transported to the hospital for his second visit, which resulted in surgery. Plaintiff alleges, however, that Pierce was aware of his need for medication and did nothing to make sure that he received that medication. Making all inferences in Plaintiff's favor, the fact that Pierce later ordered Plaintiff transported to the hospital does not mitigate this alleged earlier failing; Plaintiff's Complaint contends that he would not have needed transport to the hospital if Pierce had not prevented him from receiving medication. The motion will be denied with respect to Defendant Pierce as well.

Defendants likewise argue that Plaintiff does not allege that Defendants Ellwanger, Hubbard, Raso, Torruella, Owens, Lamp, Cleveland, Dick, Clark, Pledger, and Barrows–the corrections officers who guarded him during the period in question–engaged in any culpable conduct. Defendants insist that Plaintiff has alleged only that they placed him under constant observation, which does not amount to a claim that they disregarded any known risk to his health and safety. The Court disagrees. With regard to Defendant Ellwander, a supervisor of the other officers, Plaintiff alleges that he was aware of Plaintiff's need for medical treatment and did nothing to ensure that he received it, as well as actively preventing him from receiving some treatment. With regard to the other Defendant corrections officers, Plaintiff alleges that he made these officers aware of his specific medical needs, showing them evidence of the worsening condition of his wounds, but they refused to take any action to assist him. Such

allegations are sufficient to state a claim for deliberate indifference, and the motion will be denied in this respect as well.

### B. <u>Monell</u> Liability

Defendants next argue that Plaintiff has not pled facts sufficient to support a claim that his injuries were the result of an official policy or custom, and any claim brought against the County of Ostego pursuant to 42 U.S.C. § 1983 must be dismissed. Municipal liability is limited under Section 1983 by <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978). In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006). To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." <u>Bd. of County Commr's v. Brown</u>, 520 U.S. 397, 403 (1997). "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Dangler v. New York City Off Track Betting Corp.</u>, 193 F.3d 130, 142 (2d Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 694). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." <u>Connick v. Thompson</u>, 141 S. Ct. 1350, 1359 (2011). Claims against the County would thus be proved by showing that Plaintiff's rights were violated "pursuant to a governmental custom, policy, ordinance, regulation, or decision." <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983). Plaintiff must demonstrate "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." <u>Id.</u>

Defendants contend that Plaintiff's allegations are insufficient to establish either that the Defendant County had insufficient medical staff at the Jail or that the County failed adequately to train employees. Indeed, Defendants contend, the allegations in the Complaint establish that the County's policies led to proper medical treatment for the Plaintiff.

The Court will also deny the Defendants' motion on these grounds. Making all inferences in the Plaintiff's favor, the Court reads the Complaint to allege that the Plaintiff arrived at the Defendant County's Jail suffering from at least one serious medical condition. Plaintiff alleges that he informed the intake officer of his medical needs, including his need for prescription medication, but the Jail did nothing to confirm his need for those medications and to see that he received them. This inaction led to a festering wound and spreading, dangerous infection that would not have appered with proper treatment. The Complaint further alleges that Plaintiff was seen by medical providers who likewise did nothing to ensure that he received necessary medications. This failure to provide medications led to serious and dangerous complications to Plaintiff's MRSA infection, as well as exacerbated the symptoms associated with heroin withdrawal and mental illness. Moreover, as explained above, Plaintiff alleges that these failings were not just the result of the acts of disinterested or malfeasant employees, but were the consequence of policies and/or practices in place at the jail that failed to assess and address the needs of inmates with health concerns like those faced by the Plaintiff. See Complt. at ¶¶ 78-79, 81. These allegations certainly make it plausible that Plaintiff's injuries were caused by policies and/or practices that violated his constitutional rights.

**C.     Defendants Devlin and Baulch**

Defendants next argue that no allegations in the Complaint can plausibly establish that either Defendant Devlin or Defendant Baulch were personally involved in any constitutional violation, and they should be dismissed from the Complaint. Defendants, in reply to Plaintiff's response in opposition to their motion, contend that Plaintiff has not addressed this argument and has therefore conceded that his claims against these Defendants are inadequate.  Since the Plaintiff has opposed the motion, the Court will nevertheless test the adequacy of the allegations against Devlin.[2]

Plaintiff's claims against Defendant Devlin consist of allegations that Defendant was responsible for the inadequate policies and/or practices at the jail that caused his injuries.  See Complt. at ¶¶ 74, 78-82.  Defendants argue that Plaintiff has not alleged any individual actions by Devlin that caused a violation of Plaintiff's constitutional rights. While Defendants are correct that "[p]ersonal involvement of the defendant in the alleged deprivation is a prerequisite to recovery of damages under § 1983," courts have also concluded that an actor can have "personal involvement" if "the defendant (1) created or permitted the continuance of a policy that caused the alleged deprivation, (2) failed to remedy the alleged deprivation after learning of it, or (3) was grossly negligent in managing subordinates who caused the alleged deprivation."  K & A Radiologic Tech. Servs. v. Commissioner of the Dep't of Health, 189 F.3d 273, 278 (2d Cir. 1999).  Here,

---

[2]This is especially so because the Court would not dismiss the claims against Devlin with prejudice in any case.  Defendants contend that more facts must be plead to establish a plausible claim against him.  Under those circumstances, the Court generally permits a Plaintiff, if he can, to file an amended complaint that states facts sufficient to raise a plausible claim.

the Court reads the Complaint to allege that Defendant Devil was responsible for creating and/or permitting policies to continue that caused a violation of Plaintiff's constitutional rights.   As such, Plaintiff has alleged facts sufficient to make plausible that he is entitled to recover against the Defendant, and the motion will be denied in this respect as well.

Plaintiff's allegations against Defendant Baulch are that she, as Supervising Facility Nurse at the Jail, was in charge of insuring that a prisoner, like Plaintiff, who had a serious medical need, received a proper evaluation and proper medical treatment. Complt. at ¶ 69.  She either performed the evaluation herself or arranged for another to do so.  Id. at ¶ 71.  Plaintiff thus alleges that Baulch was made aware of his various medical issues and his need for treatment, but that she did nothing for five days to get that evaluation for Plaintiff.  Id. at ¶¶ 73, 76-77.  Making all inferences in Plaintiff's favor, the Court finds that the Complaint alleges that Plaintiff's failure to receive proper medication and treatment was in part a result of Baulch's failure to act as her job required her to act.  The Court finds that Plaintiff alleges that Baulch was aware of Plaintiff's need for such attention and consciously disregarded that risk.  Such allegations state a plausible claim for deliberate indifference to a serious medical need, and the motion will be denied in this respect as well.

### D.    Qualified Immunity

Finally, Defendants contend that they are entitled to qualified immunity. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

24

Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (quoting McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)). Qualified immunity applies when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" Betts v. Shearman, 751 F.3d 78, 83 (2d Cir. 2014) (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)). A court should resolve questions of qualified immunity at the earliest possible stage of the litigation. Drimal v. Tai, 786 F.3d 219, 225 (2d Cir. 2015). To survive a motion to dismiss based on qualified immunity, a plaintiff must plead facts sufficient to meet the Iqbal plausibility standard which show "(1) that the alleged official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Wood v. Moss, 134 S.Ct. 2056, 2066-67 (2014) (quoting Ashcroft v. al-Kidd, 563 U.S. ___, ___, 131 S. Ct. 2074, 2077 (2011)). A defendant asserting qualified immunity can prevail if "the facts supporting the defense appear on the face of the complaint." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). At the same time, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion . . . must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." Id. at 436.

Defendants argue that Plaintiff fails to allege any facts "that would substantiate a theory that any of the County Defendants' actions violated any clearly established law." Defendants' Brief, dkt. # 49-1 at 18. Defendants' position is that, since the Defendants provided Plaintiff with medical treatment and he disagrees with the treatment provided, he cannot plausibility allege any deliberate indifference occurred. The Court has

already found that the Plaintiff has pled facts sufficient to allege a violation of his constitutional rights by Jail officials who refused to provide him necessary and prescribed medical treatment for a serious medical need of which they were aware. The question here is whether the facts alleged in the Complaint make plausible that a reasonable correctional officer in Defendants' positions would know that his or her conduct was unlawful.  Defendants offer no argument as to why it was objectively reasonable for them to believe their conduct was lawful under the circumstances.

Plaintiff has alleged that each of the Defendants were aware of the infection and medical issues he faced; no reasonable officer or health care provider under those circumstances could not believe that failing to provide him with prescribed medication and treatment for a serious infection that appeared to be spreading would amount to deliberate indifference to a serious medical need and violate the law.  Plaintiff has therefore alleged facts which make it plausible that the affirmative defense of qualified immunity does not apply in this case.  This conclusion applies to all the Defendants, whether they are liable, as the officers, for directly ignoring the need for treatment as Plaintiff suffered from serious pain, or for failing to insure that Plaintiff received proper care and treatment, as well as the intake officers, examining nurses, and policy makers. The motion will be denied in this respect as to all defendants.  The Court of course recognizes that Defendants may raise the issue again at an appropriate point in the litigation.

## IV.     CONCLUSION

For the reasons stated above, the Defendants' motion for judgement on the

pleadings, dkt. # 49, is denied.

IT IS SO ORDERED.

Dated:   January 7, 2016

Thomas J. McAvoy
Senior, U.S. District Judge