**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIEN CADWALLADER,

                Plaintiff,

v.                                      3:15-cv-139
                                      (TJM/DEP)

RICHARD J. DEVLIN, JR., COUNTY OF
OSTEGO, ADAM PIERCE, LYNN BAULCH,
LINDA GILMORE, JULIE ANDREWS,
ADAM TILBE, MICHAEL ELLWANGER, JARED
HUBBARD, JAMES RASO, JESSE TOURELLA,
CHRISTOPHER OWENS, KYLE LAMP,
AARON CLEVELAND, PAULA DICK,
MICHAEL CLARK, KEVIN BARROWS,
DAVID PLEDGER, JR., and PATRICK LAPORTE,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THOMAS J. McAVOY
Senior United States Judge

## <u>DECISION and ORDER</u>

      Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, alleging that

Defendants violated his constitutional rights while he was incarcerated.  Presently

before the Court are the parties' various motions for summary judgment.  <u>See</u> dkt. #s

93, 96, 99.  The Court has determined to decide the motions without oral argument.

**I.**      **BACKGROUND**

      This action concerns Plaintiff's treatment while incarcerated at the Ostego

County Jail.  Plaintiff alleges that he had a serious infection from a dog bite when he

was first admitted to the jail.  He also alleges that he suffered from serious addiction

and mental-health conditions which required medication and treatment.  Despite these

allegedly serious medical needs, Plaintiff contends, Defendants refused to provide him

treatment.  His Complaint alleges violations of his constitutional rights due to this conduct.

After the Court partially denied motions to dismiss from various Defendants, the parties engaged in discovery.  At the close of discovery, the parties filed the instant motions.

## II.    LEGAL STANDARD

The motions before the Court seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A

2

party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.    ANALYSIS.

The parties seek summary judgment on various grounds, which the Court will address in turn, as appropriate.

### A.    Defendant Julie Andrews

Defendant Julie Andrews seeks summary judgment on all the claims against her, arguing that no evidence supports any finding that she was deliberately indifferent to Plaintiff's serious medical needs or that she violated any state tort law.

### i.    Background Facts

On or about January 11, 2012, Plaintiff claims he was attacked and bitten by a pit bull. Defendant Julie Andrews' Statement of Material Facts ("Andrews Statement"), dkt. # 93-22, at ¶ 36.[1]  Plaintiff sought treatment immediately at A.O. Smith Fox Hospital. Id. at ¶ 37. He remained hospitalized for three days. Id. He was then discharged and given a prescription for oral antibiotics. Id. at ¶ 38. Despite taking this medication, plaintiff's injured leg continued to get worse, and on January 20, 2012, he sought treatment at St. Peter's Hospital in Albany, New York. Id. at ¶¶ 39-40. At the

---

[1]Both Parties filed statements of material facts as required by the local rules. The Court will cite to Andrews' facts for facts which are uncontested and will note the disagreements where the facts are contested. The Court also examined the Plaintiff's statement of material facts submitted in support of his partial motion for summary judgment. All of the relevant facts contained in that statement are discussed here.

same time, he sought detoxification at St. Peter's.  Id. at ¶ 41.  Plaintiff remained

hospitalized there until January 25, 2012.  Id. at ¶ 42.  Plaintiff reported that upon his

discharge his leg had improved significantly, and he had completed detoxification

successfully.  Id. at ¶ 43.  He had a prescription for an oral antibiotic, Augmentin, at

discharge.  Id. at ¶ 44.

Plaintiff was on parole in February 2012.  Id. at ¶ 45.  One of Plaintiff's parole

requirements was to enter a residential treatment program for his heroin addiction at

McPike Addiction Treatment Center in Utica, New York.  Id. at ¶ 46.  He arrived at

McPike on February 1, 2012 for in-patient addiction treatment.  Id. at ¶ 47.  During this

treatment, Plaintiff received prescriptions for medications to treat pre-existing mental

health problems, including PTSD, anxiety, depression, oppositional defiant disorder,

and ADHD.  Id. at ¶ 48.  On February 6, 2012, Plaintiff received a diagnosis of a

Methicillin-resistant Staphylococcus Aureus ("MRSA") infection in his right leg.  Id. at ¶

49.  He received a prescription for a ten-day course of antibiotic and pain medication.

Id.

On February 9, 2012, McPike discharged Plaintiff for, among other matters, non-

compliance.  Id. at ¶ 50.  He was turned over to the Oneonta police on an arrest

warrant.  Id.  While at the Oneonta police station for processing, Plaintiff complained

that he was suffering from an anxiety attack.  Id. at ¶ 51.  At approximately 1:50 p.m. on

February 9, 2012, Plaintiff was transported by ambulance to A.O. Fox Hospital.  Id. at ¶

52.  Plaintiff was administered Valium at the Hospital and then released without any

prescriptions for medication.  Id. at ¶ 53.

Plaintiff arrived at the Otsego County Jail (the "Jail") at approximately 8:20 p.m.

4

on February 9, 2012.  Id. at ¶ 54.  He did not have any prescription medications or medical records with him when he arrived.  Id. at ¶ 55.  Reports indicate that Plaintiff suffered an anxiety attack and threatened to commit suicide if he was not seen by a doctor.  Id. at ¶ 56.  Without citing to the record, Plaintiff asserts that he did not threaten suicide.  Plaintiff's Response to Andrews Statement, dkt. # 99-7 ("Plaintiff's Response to Andrews"), at ¶ 56.  Plaintiff was then taken by ambulance to the Bassett Hospital Emergency Department at approximately 9:35 p.m. that night.  Andrews Statement at ¶ 57.  There, Plaintiff received a diagnosis of anxiety and depression.  Id. at ¶ 58.

Plaintiff was discharged from Bassett Hospital at approximately 1:00 a.m. on February 10, 2012.  Id. at ¶ 59.  Plaintiff was discharged with a written prescription for Lorazepam, which is generic Ativan, to be administered as needed, up to 4 times per day.  Id. at ¶ 60.  Plaintiff did not receive the physical prescription; the guards who transported him back to jail received it.  Id. at ¶ 61.  Plaintiff returned to the Otsego County Jail to complete his booking at approximately 1 a.m. on February 10, 2012.  Id. at ¶ 62.  His booking sheet relates that he threatened to kill himself if he did not receive his medications and both medical and mental health providers were notified.  Id. at ¶ 63.  Plaintiff denies that he ever made such a threat.  Id. This alleged suicide threat caused Plaintiff to be placed on 24-hour constant watch.  Id. at ¶ 64.

At the relevant time, Defendant Julie Andrews worked four hours per week at the Ostego County Jail as a psychiatric nurse practitioner.  Id. at ¶ 65.  Her hours were from 8 a.m. until 12 p.m. on Fridays.  Id.  She would see and/or treat inmates only at the request of the medical staff of the Jail.  Id. at ¶ 66.  The only records she saw related to treatment were records concerning an inmate's mental health.  Id. at ¶ 67.

According to Jail policy, Andrews provided only mental-health services to inmates; the medical staff at the jail provided treatment for other medical conditions.  Id. at ¶ 68. Treatment of inmates for wounds and infections was not part of Andrews' scope of duty as a Psychiatric Nurse Practitioner.  Id. at ¶ 69.[2]  Andrews never prescribed antibiotics or pain medications while working at the Jail.  Id. at ¶ 70.  She only prescribed medication for mental health conditions.  Id. at ¶ 71.  Jail policy did not permit a Psychiatric Nurse Practitioner to treat an inmate for withdrawal symptoms at the Jail. Id. at ¶ 72.  Andrews contends that a Psychiatric Nurse Practitioner should not make recommendations to medical providers about an inmate's medical conditions, including withdrawl or infection.  Id. at ¶ 73.[3]

Defendant Andrews saw Plaintiff on February 10, 2012.  Id. at ¶ 74.  Andrews

---

[2]The Court accepts this statement as true because Plaintiff's only response is "we may want to contest this."  Plaintiff's Response to Andrews' Statement of Material Facts ("Plaintiff's Response"), dkt. # 99-7, at ¶ 69.  Not only does Plaintiff fail to cite to any evidence of record for this proposition, but Plaintiff fails to affirm that there is even a dispute about this claim.

[3]Citing to Andrews' deposition, Plaintiff disputes this statement.  See Plaintiff's Response to Andrews at ¶ 73.  Plaintiff's Response does not explain why the pages in the deposition cited refute Andrew's statement.  Andrews testified that, as part of her psychiatric evaluation, she considers a patient's physical condition.  Andrews Dep., dkt. # 96-5 at 37.  If, for example, a patient "has a physical problem, whether it's a broken arm, sprained wrist, and it manifests into some sort of psychiatric or mental condition" such an injury could "possibly" be mentioned in Andrews' diagnosis.  Id. at 37-38. Asked, however, whether she "would seek to treat that physical condition in accordance with the psychiatric treatment," Andrews replied "[n]o, that's outside of my scope of practice."  Id. at 38.  The portions of the deposition cited do not directly contradict Andrews' statement that a Psychiatric Nurse Practitioner should not make recommendations on treatment for medical conditions.  Making all inferences in Plaintiff's favor, the statements imply that a Psychiatric Nurse Practitioner's job is to treat a patient's mental health condition, whatever causes that condition.  Nothing in the statement asserts that such a Nurse Practitioner is required to provide any treatment for physical conditions, even if they are related to mental illnesses.

performed a psychiatric evaluation; the purpose of Andrews' examination was to evaluate Plaintiff's mental health.  Id. at ¶ 75.  Andrews was not provided any of Plaintiff's medical or prescription records to review.  Id. at ¶ 76.  Plaintiff reported to Andrews that he had been to the emergency room the night before after suffering a panic attack.  Id. at ¶ 77.  The emergency room physician, Plaintiff stated, prescribed Ativan; Plaintiff claimed that only this medication would help him.  Id.  Plaintiff testified that he requested Andrews to provide him with Ativan, his opiod detox medication, PTSD medication, pain medication and antibiotics.  Id. at ¶ 78.  Andrews testified that she could not recall Plaintiff complaining about his physical condition during this meeting.  Id. at ¶ 79.[4]  Andrews' treatment notes do not contain any reference to complaints about Plaintiff's physical condition; she testified that it was her practice to include reference to such complaints in her notes.  Id. at ¶ 80.

Ativan, which is a controlled substance, is not generally prescribed to inmates in a jail setting, especially when that inmate is a known substance abuser like the Plaintiff.  Id. at ¶ 82.[5]  Defendant Andrews' expert Psychiatrist has opined that benzodiazepines should not be prescribed in a jail setting, except under special circumstances.  Id. at ¶ 83.  Those circumstances do not apply to this incident.  Id

Andrews testified that she then informed Plaintiff that his prescription for Ativan

---

[4]Plaintiff disputes this claim, contending that Andrews' testimony does not "accurately [reflect] the concerns voiced by Plaintiff."  Plaintiff fails to point to any record evidence to support this claim.

[5]Plaintiff denies that controlled substances are not prescribed in a jail setting in his response to Defendant's statement, adding, in bold, **"need to figure out what they gave him."**  (emphasis in original).  This response fails to cite to the record to dispute Defendant's evidence on this matter.

would not be continued, and instead offered other medications to treat his anxiety. Id. at ¶ 84. Plaintiff disliked the alternative medications Andrews suggested. Id. at ¶ 85. He voluntarily ended his meeting with Defendant before she could complete her evaluation. Id. at ¶ 85. Plaintiff claims that he testified that alternative methods had been tried before and failed to work, but he fails to cite to any record evidence for this claim. Plaintiff's Response to Andrews at ¶ 85. Since Andrews could not complete her evaluation, she kept Plaintiff on 24/7 suicide watch. Andrews Statement at ¶ 86. In the afternoon after this meeting, Plaintiff's parole officer faxed the jail a copy of Plaintiff's prescriptions and physician orders. Id. at ¶ 87.

After his meeting with Andrews, Plaintiff was placed in a room within the jail where he was observed at all times by at least one corrections officer. Id. at ¶ 88. Plaintiff, without citing to the record, contends that "at least one corrections officer was continuously in close proximity." Plaintiff's Response to Andrews at ¶ 88. Corrections officers noted Plaintiff's position every five minutes while he was on 24-hour watch. Andrews' Statement at ¶ 89; Plaintiff's Response to Andrews at ¶ 89. Andrews notes that nothing in the record indicates that Plaintiff showed any signs or symptoms of withdrawal from the time he was placed on suicide watch until February 17, 2012. Id. at ¶ 90. Plaintiff notes that the records simply indicated whether he was sitting or laying on his bed. Plaintiff's Response to Andrews at ¶ 90. In the end, the parties dispute whether Plaintiff showed any signs of withdrawal during the time he was incarcerated in the Otsego County Jail. Andrews Statement at ¶ 91; Plaintiff's Response to Andrews at ¶ 91. Plaintiff notes that Andrews' expert report states that "'while she referenced in her note on February 10, 2012, that Plaintiff may be possibly experiencing withdrawal

8

symptoms, treatment of those symptoms would generally not have fallen within the scope of her practice.'" Plaintiff's Response to Andrews at ¶ 91.

Plaintiff next saw Andrews on February 17, 2012.  Andrews Statement at ¶ 102. They met for a psychiatric medication evaluation.  Id.  Andrews prescribed a number of medications for Plaintiff's mental health conditions, including his anxiety.  Id.  Plaintiff agreed to take the medications Andrews suggested.  Id.  Plaintiff does not contend he was treated by Andrews after February 17.  Id. at ¶ 104.  Plaintiff did not receive any treatment for withdrawal during his incarceration at the Otsego County Jail, including during the time between February 10 and February 17, 2012.  Id. at ¶ 105.

### ii.    Analysis

Andrews seeks summary judgment on several bases, which the Court will address in turn, as appropriate.

### a.  Deliberate Indifference

Plaintiff first argues that no evidence supports Plaintiff's Section 1983 claim of deliberate indifference to a serious medical need.  In this context, Plaintiff's claim is that he suffered "cruel and unusual punishment" in violation of the Eighth Amendment. Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).  Cruel and unusual punishment "'includes punishments that involve the unnecessary and wanton infliction of pain.'" Id. (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Prisoners are not entitled to "'unqualified access to health care[.]" Id. (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Still, a prisoner "can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with 'deliberate

9

indifference' to the inmate's serious medical needs." Id. (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). Two elements are therefore required to prove this standard for a pre-trial detainee like the Plaintiff.

A plaintiff must first show that "the alleged deprivation of medical care was . . . 'sufficiently serious.'" Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991). Under this standard, "[o]nly 'deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of a" violation. Id. (quoting Wilson, 501 U.S. at 298). Courts undertake two inquiries to measure this standard. First, courts ask "whether the prisoner was actually deprived of adequate medical care." Id. "[F]ailing 'to take reasonable measures' in response to a medical condition can lead to liability." Id. at 280 (quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994)). Courts consider "[f]actors" such as "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). Next, the court "asks whether the inadequacy of the medical care is sufficiently serious." Salahuddin, 467 F.3d at 280. Here, "the court [is] to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause" the plaintiff. Id.

Next, a plaintiff must show that the defendant "acted with deliberate indifference" to that serious medical need. "An official acts with deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Defendant Andrews contends that Plaintiff cannot make out a deliberate indifference claim because she attempted to treat him for his mental health conditions, ultimately prescribing him medication on February 17, 2012. Moreover, Plaintiff has no evidence that he suffered delayed care that violated his constitutional rights, or that his treatment was so inadequate that it resulted in a serious health risk. Any claim that Plaintiff's conduct injured him by failing to treat his MRSA infection is misplaced, Defendant insists, because she was a mental health professional and not charged with diagnosing or treating him for his infectious condition. Other medical professionals were charged with performing an intake examination, and Andrews was not expected to keep Plaintiff's medical conditions and prescriptions updated. She denies she even had knowledge of Plaintiff's infection. Moreover, no evidence indicates that Plaintiff went through withdrawal, and Andrews could not be liable in that context even if she were charged with providing treatment for that condition. Plaintiff responds that the evidence is sufficient to support his claim in this respect. He contends that he made Andrews aware of his need for medications for his MRSA infection, anxiety, drug withdrawal and pain, and that Andrews deliberately ignored these requests, failed to make any inquiry into his prior treatments for these conditions, and did not notify the supervising nurse at the facility of his complaints. Plaintiff also contends that several corrections officers told him that Andrews was angry at him after their first meeting and

11

would not authorize any medication for him until she met with him during her next regular day at the jail.

The Court finds that no evidence exists by which a reasonable juror could find that Defendant Andrews was deliberately indifferent to a serious medical need. Even assuming that Plaintiff suffered from a serious medical need because of his mental health issues, his infection with MRSA, and his drug withdrawal, the evidence recited above indicates that Andrews provided him with treatment for the conditions for which she was qualified to provide him with treatment. Andrews, who provides psychiatric care, did not ignore the anxiety and other mental health conditions Plaintiff faced. The undisputed evidence demonstrates that Plaintiff only went without medication for his mental health conditions for one week, between February 10 and 17, 2012. This absence of medication occurred because Andrews did not prescribe the medication that Plaintiff preferred for his condition at their initial encounter, but instead offered another. Plaintiff refused this medication. When he returned a week later, he agreed to take the medication that Andrews recommended. Plaintiff points to no complications, no serious pain, and no long-term injuries from this gap in medication. "It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment" and "'mere disagreement over the proper treatment does not create a constitutional claim [s]o long as the treatment given is adequate[.]'" Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011) (quoting Chance, 143 F.3d at 703). Here, Plaintiff's initial complaint was about the drug that Andrews prescribed. The undisputed evidence indicates that the treatment was adequate using that drug. As such, no constitutional claim can lie for this treatment.

12

Though Plaintiff contends that Andrews failed to treat him for withdrawal from his drug addiction, nothing in the record indicates that Plaintiff displayed any symptoms of withdrawal during the relevant period.  He therefore cannot point to a serious medical need that went untreated.  To the extent that Plaintiff complains that Andrews failed to discover the medications he was taking for MRSA, a reasonable juror could not find for Plaintiff in this respect either.  White v. Rosenberg, No. 07cv1807, 2010 WL 423055 (S.D.N.Y. Feb. 3, 2010), cited by Defendant Andrews, is instructive in this respect.  There, the Plaintiff sued two psychiatric care providers at New York City jails for failing to provide him medical care and violating his constitutional rights.  Id. at *1.  The Court found that Plaintiff had failed to demonstrate that his claim involved a serious medical need.  The defendants "were employed . . . to treat the mental-health conditions of inmates" and "were not responsible for treating medical conditions, such as insomnia and headaches."  Id. at *7.  Plaintiff "did not present with a psychiatric complaint; rather he complained of a medical condition: insomnia."  Id.  Though insomnia could be considered a serious medical condition "that medical condition was addressed . . . by the jail's medical clinic, where neurologists prescribed medications[.]"  Id. That situation prevails here in relation to Plaintiff's MRSA infection and his withdrawal from opiate drugs: the undisputed evidence establishes that Andrews' practice did not involve either of those conditions.  Summary judgment will therefore be granted Defendant Andrews on Plaintiff's constitutional claims.

### b.    State Law Claims

Defendant Andrews also insists that any state-law medical negligence claim against her should be dismissed.  Plaintiff has not produced an expert who has opined

13

that Andrews' treatment fell below the standard of care, and he therefore cannot maintain such a claim. Plaintiff's brief in opposition does not address this argument, and the Court will therefore grant that portion of the motion as unopposed. Any malpractice claims against Andrews will be dismissed.[6]

### B.    Motion of the County Defendants

Defendants Richard J. Devlin, Jr., County of Otsego, Adam Pierce, Lynn Baulch, Linda Gilmore, Adam Tilbe, Michael Ellwanger, Jared Hubbard, James Raso, Jesse Torruella (s/h/a Jesse Tourella), Christopher Owens, Kyle Lamp, Aaron Cleveland, Paula Dick, Michael Clark, David Pledger, Jr., and Kevin Barrows (the "County Defendants") also move for summary judgment on various grounds. The Court will address them in turn, as appropriate.

### i.    Background Facts[7]

Plaintiff's Complaint here is limited to alleged violations of his constitutional rights that occurred during the first eight days of his incarceration at the Jail, from February 9, 2012 through February 17, 2012. County Defendants' Statement of Material Facts ("County Defendants' Statement"), dkt. # 96-37, at ¶ 4.

As a result of the dog attack described above, Plaintiff was transported to Fox Hospital in Oneonta, New York. Id. at ¶ 13. He remained there as an inpatient until

---

[6]Andrews seeks summary judgment on any punitive damages claims raised against her. As no grounds for liability remain, the Court will grant the motion as it relates to summary judgment too.

[7]The Court adds these facts to address the claims in the County Defendants' motions. The Court will not repeat facts established in reference to Andrews' motion unless neccessary.

January 13, 2012.  Id.  The hospital discharged him with an antibiotic prescription for the injuries to his extremities.  Id.  Plaintiff suffered injuries to his extremities and his buttocks, but he did not have any record of an injury to his abdomen.  Id. at ¶ 14.  Plaintiff adds that he also suffered an injury to his right thumb from the incident.  Plaintiff's Response to the County Defendants' Statement ("Plaintiff's Response to County Defendants"), dkt. # 99-8, at ¶ 14.  While at Fox Hospital, Plaintiff did not have an infection on his abdomen and did not seek any treatment for his abdomen.  County Defendants' Statement at ¶ 15.

After his release from Fox Hospital, Plaintiff went to Syracuse, New York in an attempt to evade his parole officer.  Id. at ¶ 16.  Plaintiff sought to avoid the parole officer's mandate that he enter a drug rehabilitation facility.  Id.  From January 13, 2012 to Janaury 19, 2012, Plaintiff hid in Syracuse, using heroin as his leg began to swell and become discolored.  Id. at ¶ 17.  Eventually, Plaintiff traveled to Albany, New York, where he was admitted to St. Peter's Hospital for treatment of leg injuries from the dog attack and to detox from street drugs.  Id. at ¶ 18.  Plaintiff had been prescribed Augmentin, an antibiotic, at Fox Hospital; he discarded those pills, concluding that they were ineffective, before he entered St. Peter's.  Id. at ¶¶ 19-20.  Plaintiff spent seven days at St. Peter's, being discharged with a prescription for another antibiotic, Amoxicillin.  Id. at ¶ 22.  Plaintiff was discharged for non-compliance with the St. Peter's program rules on January 25, 2012.  Id. at ¶ 23.  He resumed using heroin while staying at a hotel in Albany.  Id. at ¶ 24.

From January 25, 2012 until February 1, 2012, Plaintiff remained at large; he observed during that time that his leg infections were worsening.  Id. at ¶ 26.  He did not

15

have any concern about his abdomen.  Id.

Plaintiff entered McPike Addiction Treatment Center Utica, New York on February 1, 2012.  Id. at ¶ 27.  Such treatment was part of his parole.  Id.  Plaintiff remained at McPike for 9 days, until February 9, 2012.  Id. at ¶ 28.  On that day, McPike discharged him from the program for non-compliance.  Id.  Because the discharge constituted a parole violation, Oneonta Police arrested Plaintiff on February 9, 2012.  Id.  While at McPike, Plaintiff stopped taking Augmentin and was prescribed Vancomycin for his leg wounds.  Id. at ¶ 29.  When he was admitted on February 1, Plaintiff's leg wounds were discharging green fluid.  Id. at ¶ 30.  They got worse until five days later, on February 5 or February 6, 2012.  Id.  Still, Plaintiff thought McPike provided adequate medical treatment.  Id. at ¶ 31.  Plaintiff first noticed a pimple on his abdomen on February 4, 2012.  Id. at ¶ 33.  Between February 6 and February 9, 2012, Plaintiff never requested any medical treatment for the pimple on his abdomen.  Id. at ¶ 32.  On February 9, 2012, the day he was booked into the Jail, Plaintiff noticed that the pimple seemed to be getting better.  Id. at ¶ 34.

Plaintiff did not have any medical prescriptions or medications in his possession when he was discharged from McPike and taken into custody by the Oneonta Police on February 9, 2019.  Id. at ¶ 35.  Plaintiff was taken to Fox Hospital on February 9, 2012.  Id. at ¶ 36.  Without citing to any facts in the record, Plaintiff contends that he received evaluation and treatment for mental health problems at the Hospital.  Plaintiff's Response to the County Defendants at ¶ 36.  Plaintiff did not mention any leg or abdomen issues to any medical personnel at the hospital.  County Defendants' Statement at ¶ 37.  He attributes this silence to his claim that his visit to Fox Hospital

16

was related to mental health issues, not his infection.  Plaintiff's Response to the

County Defendants, at ¶ 37.  Plaintiff was not prescribed any medication while he was

at Fox Hospital and when discharged on February 9, 2012, and Plaintiff did not receive

any prescription medication and was not given any prescriptions by Fox Hospital staff.

County Defendants' Statement at ¶¶ 38-39.  Plaintiff, citing to a report from the New

York State Commission of Corrections on an investigation into his care at the Ostego

County Jail, contends that he was treated with Valium at the hospital, which had listed

his medications as Neurontin, Suboxone, Valium and Ultram.[8]  Plaintiff's Response to

the County Defendants at ¶¶ 38-39.  Plaintiff testified that the medical care he received

at Fox Hospital, St. Peter's Hospital, and McPike was adequate and/or professional.

County Defendants' Statement at ¶¶ 40-42.

Plaintiff did not receive a prescription for antibiotics while at Fox Hospital.  Id. at

¶ 43.  Without citing to the record, Plaintiff points out that he was already on a course of

Vancomycin, and that he had been transported to Fox Hospital due to an anxiety

attack.  Plaintiff's Response to the County Defendants at ¶ 43.  Defendants contend

that no health care provider or staff member at St. Peter's Hospital prescribed an

antibiotic treatment for an infection to his abdomen during Plaintiff's February 9, 2012

visit to that Hospital.  County Defendants' Statement at ¶ 44.  Plaintiff, again without

citing to the record, calls this statement "misleading," because Plaintiff was being

treated with intravenous antibiotics at St. Peter's, and "such antibiotics would address

---

[8]The parties dispute the admissibility and persuasive power of this document.
The Court will not address this issue other than to find that the document is irrelevant to
the extent that it provides legal conclusions.  In any case, the exhaustion issue is
dispositive and the Report is not relevant to that issue.

an infection anywhere in his body, not just his abdomen. Plaintiff's Response to the County Defendants, at ¶ 44. Plaintiff also did not receive a prescription for antibiotic treatment while at McPike from February 1-9. County Defendants' Statement at ¶ 45. Plaintiff responds in the same way to this statement as to the previous one. Plaintiff's Response to the County Defendants at ¶ 45. Similarly, Plaintiff did not receive any antibiotic prescriptions during his visits to St. Elizabeth Hospital on February 8, 2012 and Bassett Hospital–Cooperstown on February 9-10, 2012. County Defendants' Statement at ¶¶ 46-47. Defendants also contend that Plaintiff did not receive a prescription for antibiotics when he returned to Bassett on February 14, 2012. Id. at ¶ 48. Plaintiff alleges that he began antibiotic treatment three days later. Plaintiff's Response to the Town Defendants at ¶ 48. He does not cite to the record for this claim. Id.

Plaintiff was held in the booking cell area for 60-90 minutes when he first arrived at the Jail. Town Defendants' Statement at ¶ 50. He was then transported to Bassett Hospital due to his complaint about a panic attack. Id. at ¶ 51. The parties disagree about whether Plaintiff expressed concern at Bassett about an infection on his abdomen which could have been related to MRSA, demonstrating that his infection was spreading. Town Defendants' Statement at ¶¶ 52-53; Plaintiff's Response to the Town Defendants at ¶¶ 52-53. Plaintiff testified at his deposition that he "was taking medication and . . . had an infection in [his] leg" when he arrived at Bassett. See Exh. A to Town Defendants' Motion, dkt. # 96-2, at 53. He "had a small lump on [his] abdomen, that may or may not have been related to" his leg infection. Id. Plaintiff testified that he was worried that the lump on his abdomen was related to his leg

infection.  Id. at 34.  According to the Plaintiff, the Bassett doctor refused to issue him new antibiotics because he already had a prescription for those drugs from McPike.  Id. As of February 9, 2012, however, the lump on Plaintiff's abdomen was not growing, and he had not been prescribed any medication specifically for that issue.  County Defendants' Statement at ¶¶ 54-55.  He had been prescribed an antibiotic, and Plaintiff argues that the prescription could have applied to an infection in his abdomen as well. Plaintiff's Response to the County Defendants at ¶ 55.

When Plaintiff arrived at the Jail from McPike Treatment Center on February 9, 2012, he did not possess any prescription medications and could not name the medications he had been taking at the treatment center.  County Defendants' Statement at ¶ 56.  When Bassett discharged Plaintiff on February 10, 2012, he had only a prescription for Lorazepam, to be taken as needed.  Id. at ¶ 57.  Plaintiff contends that he did not need a new prescription for antibiotics, as he already had one from McPike.[9]  Plaintiff's Response to County Defendants at ¶ 57.  Doctors at Bassett did not prescribe Plaintiff an antibiotic before discharging him back to the Jail, either on February 9, 2012, or February 14, 2012.  County Defendants' Statement at ¶ 58.  The parties dispute whether Plaintiff complained about an infection in his abdomen to Bassett doctors on Feburary 9 or 10, 2012.   County Defendants' Statement at ¶ 59; Plaintiff's Response to the County Defendants at ¶ 59.  The County Defendants claim he did not.  County Defendants' Statement at ¶ 59.

---

[9]Plaintiff's source for this claim is his deposition.  The pages cited contain Plaintiff's assertion that he had been prescribed an antibiotic at McPike.  See Plaintiff's Deposition, Exh. A to County Defendants' Motion, dkt. # 96-2, at 33-34.  Plaintiff did not testify to the name of the antibiotic prescribed in this section of the deposition.

In testifying about his abdominal issue in June 2012, Plaintiff stated that he had

not arrived at the Jail with an abdominal infection, but did have a small lump on his

abdomen that could have been related to the MRSA infection in his leg.  Id. at ¶¶ 60-61.

He said that he had first noticed a "small zit" on his stomach on February 4, 2012.  Id. at

¶ 62.  That small zit became a "larger pimple" around February 6.  Id.  He switched

medications on February 6, 2012 and the pimple did not get any bigger.  Id.  As of

February 10, 2012, the infection on his abdomen was the size of a "penhead."  Id. at 63.

Plaintiff completed the booking procedure at the Jail after he returned from

Bassett Hospital on February 10, 2012.  Id. at ¶ 64.  The parties here dispute whether

Plaintiff's Parole Officer, Patrick LaPorte, provided the Jail with Plaintiff's medication list

from McPike, either by handing over a copy or faxing one.  Id. at ¶¶ 65-66.  Defendants

insist that Plaintiff's medication list was not provided to any county Defendant by the

Parole Officer.  Id. at ¶ 66.  LaPorte testified at his deposition that Plaintiff "had a list of

prescription medication" when he was discharged from McPike.  See LaPorte Dep.,

Exh. H to County Defendants' Motion, dkt. # 93-10 at 7-8.  He testified that he faxed a

prescription list to the Jail on February 10, 2014.  Id. at 9.  LaPorte could not testify as

to the contents of that list, but recalled that he "faxed his medical prescription–the

script–that was in the discharge paperwork from McPike."  Id. at 11.  He never followed

up to determine whether the Jail received his fax, other than to note that he had

received a fax confirmation.  Id. at 16-17.

The document that Plaintiff contends LaPorte faxed is marked as Physician's

Orders from McPike.  See Exh. B to Plaintiff's Response, dkt. # 99-4.  The Orders

indicate that Plaintiff was admitted on February 1, 2012 for treatment of chemical

20

dependencies.  Id.  The Orders list various medications, such as Tylenol, Maalox Plus, and nicotine patches and gum.  Id.  The Orders list a stop date and a start date.  Id.  Included in those Orders was an antibiotic, Augmentin, which was to be administered twice a day for ten days.  Id.  Later, however, after doctors on February 2, 2012 sent out a left leg wound culture to a lab for analysis, the Orders stopped the Augmentin and instead prescribed Vancomycin, another antibiotic, twice daily to treat MRSA.  Id.  The Orders do not contain any prescriptions that could be filled at a pharmacy.  Id.  Plaintiff contends that if these Orders had been provided to medical professionals, they would have known that the Plaintiff was being treated with antibiotics and would have ensured the treatment continued.  Plaintiff's Response to County Defendants' Statement, at ¶ 69.

No member of the Jail's medical staff or any Defendant in this action ever received the two-page Orders.  County Defendants' Statement at ¶ 70.[10]  LaPorte never followed up to find out if his fax had been received.  Id. at ¶ 71.  Plaintiff points out that he did receive a fax confirmation.  Plaintiff's Response to the County Defendants at ¶ 71.  LaPorte's fax was sent to a number posted on the wall of the Parole Office that had previously been used to send warrants to the Otsego County Sheriffs Office.  County Defendants' Statement at ¶ 72.  LaPorte discarded any fax confirmation he received.  Id. at ¶ 73.  Investigators of the incident never interviewed LaPorte about the fax.  Id. at ¶ 74.

Plaintiff remained at Bassett hospital from 9:53 p.m. on February 9, 2012 until

---

[10]Plaintiff's Response does not respond to this particular statement, and the statement is therefore deemed admited.

his discharge at 12:47 a.m. on February 10, 2012.  Id. at ¶ 75.  Plaintiff was discharged

without any prescription or treatment for a pimple or infection on Plaintiff's abdomen.

Id. at ¶ 76.  At the time, the pimple was, according to the Plaintiff, "a very small pustule,

the size of maybe a pen-head."  Id. at ¶ 77.  Plaintiff did not complain about the pimple

when he returned for his booking.  Id. at ¶ 78.  Plaintiff argues that he did complain

about a lack of medication, including antibiotics and pain medication, during his

booking.  Plaintiff's Response to the County Defendants at ¶ 78.

Plaintiff underwent continuous observation at the Jail from February 10 through

February 16, 2012.  County Defendants' Statement at ¶ 87.  He was transported again

to Bassett Hospital February 14, 2012.  Id. at ¶ 88(g).  Defendant Lieutenant Adam

Pierce directed this transport for treatment of the abscess noted on Plaintiff's abdomen.

Id. at ¶ 89.  This was the first contact that Pierce had with Plaintiff at the Jail.  Id. at ¶

90.  Doctors at Bassett performed a minor surgical procedure on that date to drain a 12-

square centimeter abscess on Plaintiff's abdomen.  Id. at ¶ 91; Plaintiff's Response to

the County Defendants at ¶ 91.[11]  Plaintiff was discharged after this procedure, rather

than admitted.  County Defendants' Statement at ¶ 92.  The Bassett Hospital Staff did

not prescribe him any medication, including any antibiotics.  id. at ¶¶ 93-94.  Plaintiff

was again transported to the Bassett Hospital on February 17, 2012, for an evaluation.

Id. at ¶ 95.[12]

Plaintiff admits he was familiar with the Jail's inmate grievance procedure and

---

[11]Plaintiff does not provide a source for his claim that the abscess was 12-square centimeters.

[12]Plaintiff does not respond to this statement, and it is deemed admitted.

procedure for completing medical request forms to obtain access to a nurse or physician.  Id. at ¶¶ 97-98.  Plaintiff used the sick call procedures to access healthcare professionals on thirteen occasions during February 2012, including two visits to the Bassett Hospital Surgical Center to treat his abdomen.  Id. at ¶ 101.

### ii.    Exhaustion

The County Defendants first argue that Plaintiff's Section 1983 claims should be dismissed because he failed to exhaust his administrative remedies before bringing suit.  Plaintiff never filed a grievance during the relevant time period related to his medical care.  The only grievance he filed came on March 30, 2012, nearly six weeks after the care he complained about.  That grievance was denied as untimely, a decision sustained by the Citizen's Policy and Complaint Review Council.  Since Plaintiff did not file a timely grievance, he did not satisfy the exhaustion requirement.  Plaintiff responds that the grievance he filed fulfilled the exhaustion requirement.

The Prison Litigation Reform Act ("PRLA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The aim "of the PLRA is 'to reduce the quantity and improve the quality of prisoner suits . . . [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'"  Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011) (quoting Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004)).  This Act's "'exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

23

other wrong.'" <u>Johnson v. Kllian</u>, 680 F.3d 234, 238 (2d Cir. 2012) (quoting <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002)). This requirement mandates "'proper exhaustion.'" <u>Id.</u> (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006)). A "'[prisoner] must complete the administrative review process in accordance with the applicable procedural rules–rules that are defined not by the PLRA, but by the prison grievance process itself.'" <u>Id.</u> (quoting <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007)). "Exhaustion is mandatory–unexhausted claims may not be pursued in federal court." <u>Amador</u>, 655 F.3d at 96.

On March 30, 2012, Plaintiff filed an Otsego County Correctional Facility Complaint/Grievance Form. <u>See</u> Exh. Q to County Defendants' Motion, dkt. # 96-18. The grievance stated:

> Since arriving at this facility on 2/9/12, I have not received adequate medical attention. I was denied anti-biotic treatment from 2/10/12-2/14/12 which resulted in my having to get surgery. Multiple times I was withheld medications from 2/14/12-3/6/12, I was denied medical treatment on 3/11/12, and again on 3/12/12, and 3/18/12. Additionally it has taken 16 days to get a CT scan stemming from a request.

<u>Id.</u> As relief, Plaintiff sought "proper, adequate medical treatment, and to not be denied said treatment." <u>Id.</u> He sought "to bypass this informal grievance and proceed to filing a FORMAL grievance." <u>Id.</u> The grievance was not resolved within 24 hours of the initial filing and was forwarded to the grievance coordinator on March 31, 2012. <u>Id.</u>

The Jail's grievance coordinator denied Plaintiff's grievance on April 3, 2012, finding that Plaintiff had not "follow[ed] time restraints to submit a grievance" under New York law. <u>Id.</u> The most recent event referenced in the grievance occurred on March 13, 2012, and Plaintiff did not file a grievance until more than two weeks later. <u>Id.</u>

Moreover, the coordinator found, the information from the Jail's nurse concerning Plaintiff's medical treatment at the jail "lends no merit to the inmate[']s claims." Id. Plaintiff then acknowledged receipt of the decision. Id. On April 3, he expressed his wish to appeal to the Chief Administrative Officer. Id. That review fared no better; on April 4, the Chief Administrative Officer concluded that a review of the grievance revealed "no merit . . . due to time frame and content." Id. Plaintiff then sought an appeal to the Citizen's Policy and Complaint Review Council. Id. The Grievance Coordinator on April 4 indicated that Plaintiff's appeal had been submitted to that Council. Id. On May 15, 2012, the Citizen's Policy and Complaint Review Council denied Plaintiff's appeal and "sustain[ed] the action taken by the facility administration." Id.

The information recited above indicates that Plaintiff engaged in the grievance procedure established by the Jail in connection to Defendants' alleged failure to provide him with medicine. Defendants offer no argument that Plaintiff failed to engage in the grievance procedures. Instead, they seek judgment on the basis that Plaintiff failed to engage in the procedure in a timely fashion.[13] Regulations of the New York State

---

[13]Plaintiff's response to Defendant's argument on exhaustion is brief, stating in relevant part:

> The grievance filed by Plaintiff complained that "since arriving at this facility on 2/9/12, I have not recieved [sic] adequate medical attention." He further requested that he be permitted to bypass the informal grievance process and proceed to a formal grievance. In response, the jail denied the claim, stating "[i]n response to your wishes to file a formal grievance you have done so by filling out this form." Plaintiff's grievance was reviewed by the Grievance Coordinator and by the Chief Administrative Officer, and denied by both. On May 15, 2012, the Citizen's Policy and Complaint Review Council sustained the facility's

Commission of Corrections establish that an inmate "must file a grievance within five days of the date of the act or occurrence giving rise to the grievance." 9 CRR-NY 7032.4(d). The Jail cited this provision in denying Plaintiff's grievance, and that decision was upheld on appeal. See Exh. Q to County Defendants' Motion, dkt. # 96-18. The grievance was filed nearly six weeks after the failure-to-treat that is the subject of Plaintiff's claims. Plaintiff offers no argument or evidence for why he failed to file a timely grievance, such as interference by the government. See Hubbs v. Suffolk Cnty. Sherriff's Dept., 788 F.3d 54, 59 (2d Cir. 2015) (finding that "administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors–for example, threats from correction officers–rendered a nominally available procedure unavailable as a matter of fact.").

In examining the need to comply with procedural rules in this context, the Supreme Court has found that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of the proceedings." Woodford, 548 U.S. at 91. Exhaustion serves an important purpose in the prison context: "[i]t gives prisoners an effective incentive to make full use of the prison grievance process and . . . provides prisons with a fair opportunity to correct their

---

action. The County Defendants do not state what further exhaustion would be necessary. As such, the Court should deny the exhaustion defense.

Plaintiff's Brief, dkt. # 99-10, at 6 (internal citations omitted). Plaintiff does not contend that he exhausted any claim at an earlier date or that anyone at the Jail frustrated his attempts to exhaust his remedy before April 2012.

own errors." Id. at 94.  Requiring prompt grievances also allows the prison to identify witnesses and question them "while memories are still fresh, and evidence can be gathered and preserved." Id. at 95.  If, however, a prisoner can bring a claim in federal court without following the prison's procedural rules, then the prison loses "a fair opportunity to consider the grievance." Id.  From this perspective, the Court noted, filing a timely grievance under the prison rules is necessary.  Otherwise, "a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time." Id.  Once the prison rejected the grievance as untimely, "the prisoner could proceed directly to federal court." Id.

Courts in this Circuit have adopted this logic, finding that Plaintiff whose grievances were rejected as untimely had failed to exhaust their administrative remedies.  See Scott v. Gardner, 287 F.Supp.2d 477, 489 (S.D.N.Y. 2003) ("'Failure to file a timely grievance constitutes failure to exhaust administrative remedies as required by the PLRA.'") (quoting Cole v. Miraflor, No. 02 Civ. 9981, 2003 WL 21710760 at *2 (S.D.N.Y. July 23, 2003)); Long v. Lafko, 244 F.Supp.2d 444, 447 (S.D.N.Y. 2003) (Plaintiff's "failure to timely commence a requisite step in DOCS's inmate grievance procedure would run afoul of the PLFRA's exhaustion standard and would constitute sufficient ground to dismiss his complaint."); Dove v Bator, No. 02-CV-833S, 2004 WL 1698426 at *4 (W.D.N.Y. July 28, 2004) (same); Martinez v. Williams, 349 F.Supp.2d 677, 684 (S.D.N.Y. 2004); Burns v. Zwillinger, No. 02cv5802, 2005 U.S. Dist. LEXIS 1912, at *7-8 (S.D.N.Y. Feb. 9, 2005) (failure to file timely appeal of denied grievance is failure to exhaust administrative remedies).

The uncontested evidence in this case demonstrates that Plaintiff did not file a

timely grievance regarding his failure to receive medical treatment and medications during the relevant time period.  This failure to file a timely grievance did not give prison officials a timely opportunity to rectify the situation giving rise to Plaintiff's Section 1983 claims.  The Court must therefore grant the County Defendants' motion with respect to Plaintiff's Section 1983 claims.

The evidence related above could permit a reasonable juror to find that Plaintiff complained to guards about failing to receive his antibiotic medication.  Plaintiff could not argue, however, that any complaints he made to jail guards about his medical condition constitute grievances that fulfill the exhaustion requirement.  The Second Circuit Court of Appeals has emphasized that merely putting prison officials on notice of conditions or other concerns is insufficient to constitute exhaustion.  Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007).  "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance' and 'the prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules.'" Id. (quoting Woodford, 541 U.S. at 95).

 As all claims against these Defendants are brought pursuant to Section 1983, the motion for summary judgment will be granted and the case dismissed against those parties.[14]

---

[14]Defendant Andrews did not move for summary judgment based on any failure to exhaust.  The Court therefore considered whether Plaintiff had evidence to support his deliberate indifference claims against her.  "The failure to exhaust available administrative remedies is an affirmative defense."  Johnson v. Trestman, 380 F.3d 691, 695 (2d Cir. 2004).  Such a "defense is waiveable."  Id.

28

### iii.   Deliberate Indifference

Even if the Plaintiff could demonstrate that he properly exhausted his administrative grievances, the Court would find that Plaintiff has failed to demonstrate that any Defendant violated his constitutional rights through deliberate indifference to a serious medical need.  The evidence recounted above indicates that the medical condition about which Plaintiff complained during the period the parties agree is relevant was an abscess on his abdomen.  Plaintiff contends that he had prescriptions for antibiotics when he arrived at the prison.  Defendants, he further contends, were aware of these prescriptions and failed to provide him with them.  This lack of antibiotics, he contends, caused the abscess to appear and necessitated surgery and a painful healing process.  This failure to provide Plaintiff with antibiotics, Plaintiff contends, amounts to deliberate indifference to a serious medical need.

Setting aside whether the condition on Plaintiff's abdomen constituted a serious medical need–Defendants dispute this–Plaintiff has not advanced any evidence by which a reasonable juror could conclude that moving Defendants were deliberately indifferent to that serious need.   Plaintiff here alleges he was denied treatment.  The inquiry in this respect is one that focuses on whether a defendant "harbored the requisite mental state when" that defendant "denied [Plaintiff] treatment."  Hilton v. Wright, 673 F.3d 120, 127 (2d Cir. 2012).  This requires a showing that the defendant "knew of disregarded an excessive risk to [Plaintiff's] safety; that he not only was aware of facts from which a reasonable person would conclude that [plaintiff] faced an excessive risk, but that he personally *actually* drew that inference."  Id. (emphasis in

original).

The uncontested facts here demonstrate that Plaintiff arrived at the prison suffering from various medical conditions, including a severe infection and mental-health issues that included anxiety. When Plaintiff suffered an anxiety attack, he was immediately transported to a hospital, where he received treatment. At the hospital, Plaintiff did not seek or receive treatment for his infection, whether to his legs or abdomen. No evidence indicates that Defendants were aware of any prescription Plaintiff possessed for an antibiotic, which they then denied him. Even assuming they received the faxed records from McPike treatment center, none of those records contained a prescription for an antibiotic. When Plaintiff later complained of an abscess, he was transported to the hospital within a reasonable amount of time. He received treatment for this condition, and that treatment resolved the problem. Defendants thus had no information from a credible medical source that Plaintiff was not receiving proper treatment for the abscess. They had only complaints from the Plaintiff. No reasonable juror could find that Defendants, who clearly provided Plaintiff with medical treatment that addressed each of his health problems, possessed the requisite state of mind for deliberate indifference.

In any case, Plaintiff has offered no evidence other than his own speculation to demonstrate that any failure to provide him medication caused his abscess. He has thus failed to produce evidence that any deliberate indifference, if it existed, caused his injury. Thus, even if Plaintiff had exhausted his administrative remedies, he could not

prove his constitutional claim against any Defendants.[15]

**C.    Plaintiff's Motion**

Plaintiff moves for summary judgement on his claims against the County.  As the

Court has granted the Defendants' motions, Plaintiff's motion will be denied.[16]

## IV.    CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment,

dkt. #s 93, 96, are hereby GRANTED.  Plaintiff's motion for partial summary judgment,

---

[15]A number of the individual Defendants seek summary judgment on the basis that the Plaintiff has no evidence that they were in any way involved in any alleged violations; indeed, some contend, Plaintiff did nothing to develop any evidence against them.  Plaintiff responds with a narrative about the way that the Defendants who were jail guards ignored his complaints about his allegedly worsening infection.  His affidavit and statement of material facts in support of his own summary judgment motion repeatedly assert that he complained to officers about the condition of his legs and abdomen and his need for medication.  Defendants deny these accusations.  While such a dispute may create a question of fact, Plaintiff has not produced any evidence to demonstrate that he did not receive medical attention for his conditions from appropriate sources; Plaintiff went to the hospital at the time of his booking, and no evidence indicates any medical provider diagnosed him with an acute infection or prescribed any antibiotics.  Plaintiff had an opportunity to seek such treatment.  Once Plaintiff's condition worsened, he received treatment, both at the hospital and for wound care when he returned to the Jail.  None of the medical evidence indicates that any Defendants' conduct caused Plaintiff's need for surgery on his abscess.  Thus, even had Plaintiff exhausted his administrative remedies, he would have no claim against these Defendants.  Likewise, since no reasonable juror could find a violation of Plaintiff's constitutional rights, no reasonable juror could find the County liable pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  Municipal liability exists "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of County Commr's v. Brown, 520 U.S. 397, 403 (1997).  As Plaintiff has no constitutional claim, the municipality cannot be liable.

[16]The Court will likewise dismiss the Defendants' appeal of Magistrate Judge David E. Peebles' decision to deny their request for discovery sanctions including the preclusion of Plaintiff's expert report.  See dkt. # 84.  The appeal is moot because of the Court's decision.

dkt. # 99, is hereby DENIED.  Defendants' appeal of the Magistrate Judge's decision,

dkt. # 84, is hereby DISMISSED and the decision AFFIRMED.

IT IS SO ORDERED

Dated: June 22, 2017

Thomas J. McAvoy
Senior, U.S. District Judge